## WARD v. TADLOCK.

### No. 14655.

Court of Civil Appeals of Texas.
Fort Worth.

Nov. 17, 1944.

McGown, McGown, Godfrey & Logan, of Fort Worth, for appellant.

Thompson, Walker, Smith & Shannon and John A. Kerr, Jr., all of Fort Worth, for appellee.

McDONALD, Chief Justice.

Fay Ward, the appellant, at the time of the transactions herein involved, operated an establishment in New York City where he made cowboy clothes to order. Dr. Brewer, a resident of Connecticut, came to appellant's place of business for the purpose of buying some riding clothes. While there he remarked to appellant that he wanted to buy a quarter horse. Appellant said that he was going to Phoenix, Arizo-

na, in a few days, and would try to find a horse for Dr. Brewer. On his way to Phoenix appellant stopped in Fort Worth, and met Hardy Tadlock, the appellee. As a result of the events that followed, Dr. Brewer came to Fort Worth and purchased four horses from Tadlock at the agreed price of $800 for each horse. Dr. Brewer gave Tadlock two checks, one for $800 and one for $2400. Payment was stopped on the checks, and Tadlock did not collect the purchase price of the horses, nor did he ship the horses to Dr. Brewer. During the course of the transactions, it was agreed between Ward and Tadlock that Ward should receive all over $500 of the sale price of each horse. Tadlock paid $1200 to Ward shortly after he received the checks given by Dr. Brewer, and brought this suit against Ward to recover the $1200 so paid to Ward.

The case was submitted to the court without a jury. The court filed findings of facts and conclusions of law. The substance of the findings is as follows: After they had been introduced to each other, Tadlock told Ward that he had a horse of the kind which Ward had said he desired to purchase. Ward wired Dr. Brewer that he had found the kind of horse Dr. Brewer desired to buy, and in response to the wire Dr. Brewer came by airplane to Fort Worth to inspect the horse. Dr. Brewer examined the horse and told Tadlock that he would take him. Tadlock had theretofore told Ward that his price for the horse was $500. Ward requested Tadlock to price the horse at $800 agreeing with Tadlock that Tadlock should first be paid his $500, and that the remaining $300, or any amount obtained for the horse over $500, should belong to Ward. Tadlock priced the horse to Dr. Brewer at $800, Dr. Brewer agreed to buy it, and gave Tadlock a check for $800. After this deal was closed, Dr. Brewer stated that he would like to buy another horse for a friend. The next day Tadlock told Ward that he had another horse in Oklahoma which he thought would suit Dr. Brewer, and that the price would be the same as for the first horse, that is, $800, and it was understood between Tadlock and Ward that Tadlock was to have $500, and that the extra $300 should go to Ward. The three men went to Oklahoma. Dr. Brewer said that the horse suited him and that he would take it. The horse was brought back to Fort Worth in a trailer. The next day Dr.

Brewer told Tadlock that he desired to buy two more horses of the same kind, whereupon Tadlock said that he had two other horses. Dr. Brewer inspected them, and said that they suited him and that he would take them, at $800 each. It was understood and agreed between Tadlock and Ward that Tadlock would receive $500 for each of these two horses, and that Ward would receive the additional $300 per horse. Tadlock had theretofore stated to Ward upon all occasions that all he wanted out of the horses was $500 each. Thereupon Tadlock, Ward and Dr. Brewer repaired to the Big Apple, a barbecue cafe, for dinner, at which place Dr. Brewer gave Tadlock his check for $2400. Dr. Brewer left, presumably to return to his home. Tadlock placed the four horses in the Fort Worth Stockyards for the purpose of shipping them to Dr. Brewer along with a shipment of other horses which it was understood were to be shipped to the same locality. Within two or three days Tadlock gave Ward his check for $1200, being $300 for each horse and went with Ward to a Fort Worth bank and identified Ward so he could cash the check. Upon several occasions Tadlock mentioned the checks which Dr. Brewer had given him, as to whether they were good, and Ward told him that the checks were good and would be paid. Such statements on the part of Ward were expressions of an opinion, since Ward had known Dr. Brewer only a short time, the banks upon which the checks were drawn being in Connecticut. Tadlock and Ward at all times believed that the checks were good and would be paid when presented to the drawee bank. Tadlock and Ward both so believed at the time Tadlock gave the $1200 to Ward and if they had not so believed Tadlock would not have given the $1200 to Ward until Dr. Brewer's checks were paid. Tadlock and Ward were mutually mistaken in believing that the checks were good and would be paid. From the beginning, and throughout the transactions, Ward was representing Dr. Brewer, and never at any time represented Tadlock. The relation of broker and client never existed between Ward and Tadlock, but Ward was acting solely as the agent of Dr. Brewer, and there was never any obligation, either legal or moral, on the part of Tadlock to pay Ward and when Tadlock gave his check to Ward it was pursuant to a mutual understanding upon the part of both that such amount would

be due Ward only in event the Brewer checks were paid in full, and then only such amount, if and when paid, after plaintiff had been paid and had received $500 per horse. Such is the substance of the material findings of the trial court.

The substance of the conclusion of law of the trial court is that Tadlock was never legally or morally bound to pay Ward any sum and that the $1200 was paid with the understanding that such amount was to be paid out of the amount collected on the Brewer checks, and that inasmuch as the checks were not paid, Tadlock is entitled to recover the $1200 from Ward.

Although it is perhaps not material, other than as tending to negative the fact of any wrongful dealing on the part of Tadlock in selling the horses to Dr. Brewer, Ward testified without objection that Dr. Brewer told him that he stopped payment on the checks because his wife objected to his buying so many horses.

The trial court rendered judgment in favor of Tadlock for recovery of the $1200 paid to Ward.

Under his first point Ward declares that the trial court erred in rendering judgment for Tadlock when the findings of the trial court establish: (1) Tadlock and Dr. Brewer entered into a binding contract for the sale of the horses. (2) The contract made by Tadlock and Dr. Brewer was not induced through any fraud or misrepresentation of Ward. (3) The court found that Tadlock and Dr. Brewer having entered into a bona fide contract for the sale of the horses, Tadlock accepted the checks of Dr. Brewer in payment for the horses through no fraud or misrepresentation of Ward. (4) Ward performed all the duties he was required to perform as agent by bringing together the parties, who subsequently entered into a binding contract of sale, the effect of which was that Tadlock assumed the risk of enforcement of the contract. As a result Ward became entitled to his commission.

Under his second point of error Ward contends that the trial court erred in rendering judgment for Tadlock on the assumption that the parties were mutually mistaken about Dr. Brewer's checks being paid, because there was no pleading of mutual mistake, and because the mutual mistake found by the trial court was as to a future event and not as to a past or existing fact.

This is not a suit to recover a commission. It is a suit to recover a payment voluntarily made to the defendant by the plaintiff. Suits to recover payments made are of many kinds, and statements of the rules governing them have not always been free of confusion. "Money voluntarily paid with full knowledge of all the facts, and without fraud, deception, duress or coercion, cannot be recovered back, although it was paid upon a void or illegal demand, or upon a claim which had no foundation in fact, and was paid without consideration." 32 Tex.Jur., p. 727. "Money may be recovered, however, where payment was induced by fraud, duress, oppression, imposition, extortion or taking an undue advantage, or by reason of a mistake of fact as distinguished from a mistake of law. * * *" 32 Tex.Jur., p. 728. It is a general rule that money paid under a mistake of fact may be recovered, but money paid under mistake cannot be recovered where it was due in honor or conscience. 32 Tex.Jur., pp. 735–737.

It is in order to determine first whether the money was owing to Ward at the time Tadlock paid him. We think that Ward has failed properly to interpret the relationship existing between him and Tadlock. He considers that it was the ordinary brokerage relationship, where the broker becomes entitled to his commission when a binding contract is entered into between buyer and seller. The relationship between Ward and Tadlock was more like that of a joint adventure. When Ward first met Tadlock he said that he wanted to buy a horse, and it was not until after Dr. Brewer came to Fort Worth that Tadlock was told that Dr. Brewer was the prospective purchaser. Nothing had been said to indicate that Ward should act as agent for Tadlock in selling the horse, and nothing was said about Ward receiving money for his efforts until Ward and Tadlock were on their way to show the horse to Dr. Brewer. Then Ward asked Tadlock if the latter objected to Ward making some money out of the deal. Tadlock said that he did not, and that he only wanted $500 for his horse. Ward then requested Tadlock to ask $800 for the horse. They agreed that Ward should have whatever the horse brought above the $500 which Tadlock was to receive for himself. These two parties simply went into a joint venture to sell Dr. Brewer a horse, and later three more horses. It is clear from the

evidence, and from the findings of the trial court, that they both understood that they were to divide the proceeds of the sales among themselves, $500 per horse to Tadlock, all over that to Ward. Instead of paying for the horses in cash, Dr. Brewer gave his checks. Although payable to Tadlock, these checks belonged in equity to both Tadlock and Ward. Ward was present when the checks were received and made no objection to taking the checks instead of cash He made no demand that the purchase price be paid in any other manner, but on the contrary several times assured Tadlock that Dr. Brewer was "all right," and that the checks would be paid. It is true that these assurances were given after Tadlock took the checks, but they were given before Tadlock paid the $1200 to Ward. Two or three days after the checks were received from Dr. Brewer, Tadlock told Ward that he would pay him his $1200. Before doing so, however, he again asked Ward whether Dr. Brewer was "all right," and whether the checks were good. Ward assured Tadlock in positive language that Dr. Brewer was all right, that the checks were good and that they would be paid.

It is clear to our minds that Tadlock was under no obligation to pay Ward the $1200.00 before Dr. Brewer's checks were paid. Tadlock and Ward were jointly interested in the proceeds, but there was not due from Tadlock to Ward a broker's commission in the ordinary sense of that term. "A check may be accepted as a payment so as to discharge the debt; as to whether it was so accepted is a question of fact. To have the effect of payment both the debtor and the creditor must intend the paper to discharge the obligation." 32 Tex. Jur., p. 658. The evidence is ample to support the theory that Tadlock did not intend, as between himself and Ward, to accept Dr. Brewer's checks as cash, and to assume the risk of their being paid. He finally treated them as cash upon the assurances of Ward that they would be paid. It is true that mere expressions of opinion, where the opposite party would reasonably treat them as such, will not constitute such fraud as will authorize the recovery of a payment made, but under the circumstances of this case it would be altogether inequitable to treat Ward's statements to Tadlock as mere expressions of opinion. Under the agreement between Ward and Tadlock the former was expect-

ing to collect his profit, or whatever it may be called, out of the proceeds of the sales, rather than from Tadlock. The situation is not unlike that in Price v. Lee, Tex.Civ.App., 119 S.W.2d 673, writ of error dismissed.

Ward charges that the trial court based his judgment upon the finding of mutual mistake, rather than upon the representations made by Ward, and that the judgment cannot stand because of the lack of pleading of mutual mistake.

"It is often said that a mistake must be mutual to permit of a recovery of money paid under its influence, but this does not seem to be essential, for if a person pays money under an honest mistake of fact on his part, although it is received by the payee with full knowledge, he may recover the money so paid, while, on the other hand, if he pays it with full knowledge of all the facts, it is voluntary and cannot be recovered even though the payee received it under a mistake of fact." 40 Am.Jur., p. 846.

Tadlock pleaded that he agreed to sell the horses to Dr. Brewer for $3200, and in connection therewith agreed with Ward that upon receipt of the $3200 from Dr. Brewer, in cash, that he would pay to Ward the sum of $1200 for aiding in the sale of the horses, and that no money was due Ward save and except upon the consummation of the sale and the receipt of the purchase price; that Ward represented that the checks were good, and would be paid; that Tadlock believed the representations; and that relying upon them he paid the $1200 to Ward.

Under the facts pleaded and proved, we do not believe that it was necessary to plead or prove that Ward also believed that the checks would be paid. He is left in the attitude of having committed a fraud if he did not so believe. He owed to Tadlock the duty of making honest answer to Tadlock's inquiries about Dr. Brewer and the checks. If there existed in Ward's mind any doubt about the checks being paid, he was not acting in good faith when he accepted payment in advance of his share of the proceeds of the sales.

It appears to us that it would have been unjust to allow Ward to retain the $1200, and that the trial court was correct in rendering judgment for Tadlock.

Affirmed.